IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

IN RE GREEN VALENTINE, INC.,

    Debtor,

P. PRESTON WILSON, Trustee,

    Plaintiff - Appellant,

v.                                                                                  No. 05-2642 B

GARY WHEELER and
WHEELER LIVING TRUST,

    Defendants - Appellees.
_____

ORDER REVERSING DECISION OF THE BANKRUPTCY COURT
AND REMANDING FOR RECONSIDERATION
_____

INTRODUCTION AND PROCEDURAL HISTORY

On October 1, 2001, an involuntary Chapter 7 petition was filed on behalf of the Debtor, Green Valentine, Inc. ("GVI") in the United States Bankruptcy Court for the Western District of Tennessee. Following entry of the order of relief on October 29, 2001, the Chapter 7 Trustee, P. Preston Wilson (the "Trustee"), filed, on September 24, 2003, a complaint for avoidance and recovery of preferential transfers against the Defendants, Gary Wheeler and Wheeler Living Trust, seeking recovery of $40,000. The case was tried and, on June 30, 2005, the bankruptcy court entered an order dismissing the Trustee's complaint. Before the Court is the Trustee's appeal from the bankruptcy court's order. The issues having been fully briefed, this appeal is now appropriate for disposition.

BACKGROUND

GVI was a licensed used car dealership specializing in antique and classic automobiles, particularly "Woodies" from the 1940's and 50's. George Coleman was the president of GVI. According to his deposition testimony, early in 2001, Gary Wheeler, who resided in California, contacted GVI, with which he had had approximately three prior dealings, inquiring about purchasing a 1939 or 1940 wood-paneled station wagon. One of these prior dealings involved the purchase of a car from or through Coleman. It was Wheeler's recollection that, in connection with the inquiry about the Woody, the two may have talked monthly "back and forth over various cars." In June 2001, Coleman faxed to Wheeler a retail buyer's order for a 1940 Woody. Coleman had sent photographs of the vehicle to Wheeler and, according to Wheeler, had it in his possession. The two agreed on a price of $40,000, which Wheeler wired to GVI's bank account on June 26, 2001. That same day, GVI executed a retail buyer's order for the vehicle reflecting that the purchase price therefor had been paid in full. It was Wheeler's impression at that time that the Woody was to be shipped to him. Wheeler repeatedly telephoned Coleman to find out when the car would be delivered, only to be told it would happen "soon."

While perusing a trade magazine, Wheeler discovered a Woody for sale and contacted the owner, who he identified as "Glen." Upon comparison of the VIN numbers, it became apparent that the vehicle advertised in the trade publication was the same one he had purchased from Coleman. The owner "had some familiarity" with Coleman but informed Wheeler that he had never sold a car to him and that he was advertising this vehicle for sale on his own. Coleman avers that, at that time, he had not made final business arrangements with the Woody's owner to purchase the vehicle. Wheeler contacted Coleman on June 13, 2001 and left a message indicating that he had located the

2

car he had purchased. Three days later, Wheeler telephoned Coleman again and was told "it was a done deal and that the trucker was on the way and to wire the money to Glen," who lived in Connecticut. The truck driver contacted Wheeler on June 16, 2001 advising that he was to pick up the car on Tuesday and it would take him about a week to make delivery. However, when Wheeler called Glen on June 17, no one had picked up the vehicle. Glen also related that Coleman was attempting to purchase the car from him at that time. According to Coleman, it was his practice to sell vehicles he did not own and that Wheeler was aware of this fact and that Coleman was acting as a broker in the transaction. Indeed, when asked in his deposition whether Coleman was essentially acting as a broker, Wheeler replied in the affirmative. Wheeler hired an attorney on June 18, 2001. At some point thereafter, Wheeler again spoke to the truck driver, who acknowledged that Coleman had told him to lie about picking up the car. In July, Wheeler requested a refund from Coleman of the purchase price, which occurred on July 31, 2001. Following the payment, $2,650 remained in GVI's account. The bankruptcy court took judicial notice that unsecured claims had been filed against the Debtor in excess of $2 million.

## ANALYSIS

On appeal, the district court reviews questions of law raised in a bankruptcy proceeding de novo. In re Carled, Inc., 91 F.3d 811, 813 (6th Cir. 1996). Questions of fact are reviewed under the more deferential "clearly erroneous" standard. In re Perlin, 30 F.3d 39, 40 (6th Cir. 1994). Under the clearly erroneous standard, "all factual findings of the bankruptcy court . . . must be upheld unless after reviewing the record below, [the] court is left with the definite and firm conviction that a mistake has been committed." In re Lambert Oil Co., Inc., 347 B.R. 173, 177 (W.D. Va. 2006) (citation and internal quotation marks omitted). Therefore, the court is to "treat the bankruptcy

court's evidentiary findings as factual determinations and analyze whether the evidence supports the bankruptcy court's legal conclusions as a matter of law." In re Carled, 91 F.3d at 813.

The Trustee alleges in this appeal that the bankruptcy court erred in: (1) holding that the parties intended in the original transaction that Coleman would act as a broker for purchasing the vehicle from a third party; (2) finding that the payment to Wheeler Living Trust was made in the ordinary course of business; and (3) concluding that the payment to the Wheeler Living Trust was made according to ordinary business terms.

The bankruptcy provision relevant to the Trustee's claims is 11 U.S.C. § 547. Subparagraph (b) permits, except as provided in subsection (c), the trustee to avoid "any transfer of an interest of the debtor in property--"

 (1) to or for the benefit of a creditor;

 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

 (3) made while the debtor was insolvent;

 (4) made--

  (A) on or within 90 days before the date of the filing of the petition; or

  (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

 (5) that enables such creditor to receive more than such creditor would receive if--

  (A) the case were a case under chapter 7 . . .;

  (B) the transfer had not been made; and

  (C) such creditor received payment of such debt to the extent provided by the provisions of this title . . .

11 U.S.C. § 547(b). The "preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor." In re Tenn. Chem. Co., 112 F.3d 234, 238 (6th Cir. 1997), reh'g and suggestion for reh'g en banc denied (May 27, 1997) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 177 (1977)).

While preferential transfers are subject to avoidance by the trustee, generally requiring the transferee to "disgorge the amount of the transfer and return it to the debtor's estate," the Bankruptcy Code provides an "ordinary course" defense to avoidance articulated in subsection (c). In re Bridge Info. Sys, Inc., 460 F.3d 1041, 1049 (8th Cir. 2006), reh'g and reh'g en banc denied (Aug. 2, 2006). The legislative purpose of the exception "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." In re Carled, 91 F.3d at 815 (citing S.Rep. No. 989, 95th Cong., 2d Sess. 88, reprinted in 1978 U.S.C.C.A.N. 5787, 5874). Subsection (c) of the statutory provision provides in pertinent part that the trustee may not void a transfer to the extent that it was

    (A)    in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

    (B)    made in the ordinary course of business or financial affairs of the debtor and the transferee, and

    (C)    made according to ordinary business terms.

11 U.S.C. § 547(c)(2). The party asserting a defense to avoidance bears the burden of showing each element of the defense by a preponderance of the evidence. In re Paradise Valley Holdings, Inc., 347 B.R. 304, 309 (E.D. Tenn. 2006). It is the bankruptcy court's analysis with respect to the defense that is the subject of the instant appeal.

As the court recognized in Paradise Valley Holdings,

> [w]hether a payment is made in the ordinary course of business and according to ordinary business terms is a factual determination.  Section 547(c)(2) was intended to protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee.

Id. at 310 (internal citations and quotation marks omitted).  Under § 547(c)(A), the debtor and creditor must have been "engaged in their usual business when the debt was incurred and when the transfers took place."  Id.

> The elements of subsection (B) are subjective, focusing upon the specific business dealings between the [debtor and creditor], while the subsection (C) analysis is objective, requiring the [creditor] to provide proof as to general business dealings within the industry itself.

Id.  "To determine whether the transactions were ordinary, courts examine several factors, including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made."  Id. (citations and internal quotation marks omitted).  Generally, courts consider the entire course of dealing between the parties and the analysis is to be highly fact-specific.  In re Tenn. Chem. Co., 112 F.3d at 237; In re Fred Hawes Org., Inc., 957 F.2d 239, 244 (6th Cir. 1992), reh'g denied (April 7 and 10, 1992).

It was the opinion of the bankruptcy court that

> the corporate debtor and Mr. Wheeler and/or the Trust, in essence, entered into an ordinary course of business agreement evidenced by the terms of the retail buyer's order that the corporate debtor was to act as a "broker" for the purposes of the Trust ultimately obtaining and acquiring title to the 1940 "Woody" from a third party to be arranged by and through the debtor.  Mr. Wheeler, as the trustee of the Trust, wired the $40,000 to Mr. Coleman expecting prompt delivery of the vehicle (or at least as immediate as cross-continental shipping/trucking would allow), and when that pre-condition was not quickly carried out, upon request of the defendants, the $40,000 purchase price was refunded by the debtor acting as a broker in this industry.

(Mem. & Order Re Pln's Compl. Under 11 U.S.C. §§ 547(b) & 550(a) Combined With Notice Of

The Entry Thereof (the "Order") at 8-9)

With respect to the subjective prong of the "ordinary course of business" showing, the bankruptcy court found that the Defendants had satisfied the elements thereof by demonstrating that they and Coleman had successful prior dealings.  Therefore, "it [was] safe to assume that the parties anticipated and expected the eventual refund of the $40,000 in this transaction if the debtor could not perform," which is precisely what occurred.  The bankruptcy court further concluded that objective factor was met

> by the defendants in that Mr. Coleman testified at the trial that in the event a vehicle to be brokered by the corporate debtor was not obtained, the money would be returned to the customer.  Although Mr. Coleman testified that he was unaware of whether this was the standard industry practice, this court finds it hard to believe that on an industry-wide basis a broker or procurement agent for antique cars (or any other industry) would not refund the full payment, absent a written agreement otherwise, to the customer if a brokered business deal could not be consummated (i.e., the broker accepts funds, cannot perform, and, as a result, refunds the money to the prospective purchaser/customer).

(Order at 9-10)  Thus, the transaction was not, in the opinion of the bankruptcy court, of the "type of transaction Congress desired to disturb through federal preference law.  Debtor's prompt refund of the $40,000 to the defendants was sufficiently made in the normal course of business and in accordance with normal industry standards (and without control by the non-insider defendants)."  (Order at 10)

It is the position of the Trustee on appeal that none of the elements of the defense were established.  He first submits that, since Coleman intended the transaction to be in the nature of a brokerage and Wheeler's impression was that the vehicle was in Coleman's possession and could be delivered promptly, the debt could not have been incurred in the ordinary course of business of both the debtor and the transferee.  It is further asserted that the retail buyer's order did not by its terms

7

establish a broker relationship. Nor did the transaction satisfy the subjective prong, the Trustee contends, because the instant arrangement, unlike previous dealings between the two, required that Wheeler hire an attorney after repeated lies on the part of Coleman as to the whereabouts of the vehicle. Finally, the Plaintiff points to the total lack of proof as to the objective prong, other than Coleman's ignorance of the relevant industry standard.

As for the Trustee's first argument, even if the retail buyer's order did not reflect that Coleman was a broker and not a direct seller, testimony adduced at trial from Coleman and Wheeler's deposition testimony support the interpretation that Coleman frequently acted as a broker in obtaining antique cars for customers and that Wheeler had knowledge of the practice. Therefore, the Court cannot say, based on the argument posed by the Trustee, that it is left with the definite and firm conviction a mistake was committed by the bankruptcy court in finding the debt was incurred in the ordinary course of the business between the two men.

The Court does, however, conclude that the decision of the bankruptcy court as to the remaining elements of the defense must be reversed. In order to satisfy the subjective prong, it must be shown that the refund was made in the ordinary course of business between Wheeler and Coleman. While the bankruptcy court was willing to assume the existence of an understanding that Coleman would return the funds if he could not locate a Woody, there was no evidence presented to establish that such an understanding did in fact exist. "The cornerstone of [the subjective] element of a preference defense is that the creditor needs to demonstrate some consistency with other business transactions between the debtor and the creditor." In re Indus. Metal Fabricators, No. 89-1814, 1990 WL 57232, at *3 (6th Cir. May 2, 1990). Based on the complete lack of evidence of any practice exercised in the ordinary course of business transactions between Wheeler and

Coleman, the subjective prong of the defense was not established. See id.

Similarly, there is no showing that the objective element had been demonstrated. When considering this prong, "the court . . . compares and contrasts the particular transaction against the 'practices' and 'standards' of the industry. A transaction is objectively ordinary if it does not deviate from the industry norm but does conform to industry custom." In re Fred Hawes, 957 F.2d at 245 n.6. Failure to present evidence of the industry standard is fatal to a claim under the ordinary course of business defense. In re R.D.F. Dev., Inc., 239 B.R. 336, 342 (6th Cir. 1999). As with the subjective element of the defense, the bankruptcy court's assumption of the nature of industry norm, absent the presentation of evidence, was not sufficient to support a finding for avoidance.

## CONCLUSION

Based on the foregoing, the decision of the bankruptcy court is REVERSED in part as set forth herein. Furthermore, this matter is REMANDED to the bankruptcy court for reconsideration of the subjective and objective prongs of the ordinary course of business defense in accordance with this opinion, including the taking of additional evidence.

IT IS SO ORDERED this 28th day of September, 2006.

            s/ J. DANIEL BREEN
            UNITED STATES DISTRICT JUDGE